UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MARVIN D. RICHARD,

    Petitioner,

v.

JERRY HOWELL, *et al.*,

    Respondents.

Case No. 2:18-cv-00181-KJD-NJK

**ORDER**

Introduction

    In this habeas corpus action, brought by Nevada prisoner Marvin D. Richard, who is represented by appointed counsel, Richard's third amended habeas petition is before the Court for resolution of the merits of the remaining claims. The Court will deny Richard's petition, as is explained below.

Background

    On October 13, 2010, Richard was convicted, after a jury trial, in Nevada's Eighth Judicial District Court (Clark County), of second-degree murder with use of a deadly weapon, and he was sentenced to 10 to 25 years in prison for the murder and an additional and consecutive 3 to 8 years for the use of a deadly weapon. *See* Judgment of Conviction, Exh. 2 (ECF No. 9-2). The conviction was the result of Richard's killing, by stabbing, of his long-time live-in girlfriend, Loreal Goodwin.

    Richard appealed, and the Nevada Supreme Court affirmed the judgment of conviction on June 8, 2011. *See* Order of Affirmance, Exh. 6 (ECF No. 9-6).

    Richard filed a pro se state habeas petition on February 21, 2012. *See* Petition for Writ of Habeas Corpus, Exh. 8 (ECF No. 9-8). Counsel was appointed for Richard, and, with counsel, Richard supplemented his petition. *See* Supplemental Petition for

Post-Conviction Writ of Habeas Corpus, Exh. 11 (ECF Nos. 9-11, 10-1, 10-2); Amended

Supplemental Petition for Post-Conviction Writ of Habeas Corpus, Exh. 13 (ECF No. 10-

4). The state district court held an evidentiary hearing on August 28, 2014. *See*

Transcript of Evidentiary Hearing, Exh. 161 (ECF No. 40-1). After the evidentiary

hearing, the court appointed an expert on battered-spouse syndrome to evaluate

Richard. *See* Order Appointing Dr. Shera Bradley, Ph.D. as Court Appointed

Psychologist, Exh. 17 (ECF No. 11-2). The court ordered supplemental briefing, and

Richard filed a second supplemental petition. *See* Second Supplemental Petition for

Writ of Habeas Corpus, Exh. 18 (ECF No. 11-3). Then, after entertaining oral argument,

the state district court denied Richard's petition in a written order filed on August 17,

2016. *See* Transcript of Proceedings, January 20, 2016, Exh. 180 (ECF No. 40-20);

Findings of Fact, Conclusions of Law and Order, Exh. 22 (ECF No. 11-7). Richard

appealed, and the Nevada Court of Appeals affirmed the denial of Richard's petition on

August 16, 2017. *See* Order of Affirmance, Exh. 28 (ECF No. 11-13).

This Court received a pro se petition for writ of habeas corpus from Richard,

initiating this action, on January 31, 2018. *See* Petition for Writ of Habeas Corpus, p. 1

(ECF No. 1-1, p. 2). The Court granted Richard's motion for appointment of counsel,

and appointed counsel to represent him. *See* Order entered February 9, 2018 (ECF No.

4). With counsel, Richard filed a first amended petition on March 23, 2018 (ECF No. 8),

a second amended petition on October 4, 2018 (ECF No. 18), and a third amended

petition, now his operative petition, on April 22, 2019 (ECF No. 50).

In his third amended petition, Richard asserts the following grounds for habeas

corpus relief:

> 1A.    Richard's federal constitutional rights were violated as a result of
> ineffective assistance of his trial counsel, on account of his trial counsel's
> failure "to call lay witnesses in support of the theory of self-defense."

1B.     Richard's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, on account of his trial counsel's failure "to present expert evidence regarding psychological issues involving intimate partner violence."

1C.     Richard's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, because "trial counsel tricked Mr. Richard into testifying in his defense."

1D.     Richard's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, because "counsel didn't ask Mr. Richard about Ms. Goodwin's aggressive nature."

1E.     Richard's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, because "counsel failed to follow up on juror tampering."

1F.     Richard's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, on account of his trial counsel's failure "to litigate the issue whether the police acted in bad faith when they failed to test Mr. Richard's blood."

2.     Richard's federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, because of trial counsel's failure to present certain evidence in mitigation at Richard's sentencing.

3.     Richard's federal constitutional rights were violated because, when he decided to testify at trial, Richard "did not knowingly and voluntarily waive his right against self-incrimination."

4.     Richard's federal constitutional rights were violated because "[t]he jury's verdict was contaminated by juror misconduct and tampering."

5.     Richard's federal constitutional rights were violated because "[t]he State failed to preserve material evidence by not testing Mr. Richard's blood, it made that decision in bad faith, and the relevant detective lied about that under oath."

6.     Richard's federal constitutional rights were violated because "[t]he State failed to timely turn over relevant discovery to defense counsel."

Third Amended Petition (ECF No. 51), pp. 11–35.

On May 22, 2019, Respondents filed a motion to dismiss (ECF No. 52), arguing that Grounds 1C, 1D and 3 of Richard's third amended petition are barred by the statute of limitations, and that Grounds 1B, 1C, 1D, 1E, 1F, 3, 4 and 5 are, in part or in their entirety, unexhausted in state court. The Court ruled on the motion to dismiss on November 5, 2019. *See* Order entered November 5, 2019 (ECF No. 61). The Court dismissed Grounds 1C, 1D, 3 and 4, and the part of Ground 5 asserting that Richard's

federal constitutional rights were violated because the detective lied under oath; the Court denied the motion in all other respects. *See id.*

Respondents then filed an answer on March 3, 2020 (ECF No. 66), and Richard filed a reply on August 7, 2020 (ECF No. 74).

Along with his reply, on August 7, 2020, Richard filed a motion for an evidentiary hearing (ECF No. 75). Respondents filed an opposition to that motion on August 21, 2020 (ECF No. 76), and Richard filed a reply on August 26, 2020 (ECF No. 77).

Analysis

Standard of Review

28 U.S.C. § 2254(d), enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA), sets forth the primary standard of review applicable in a federal habeas corpus action:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing

legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409). The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

The state courts' "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). When a state appellate court does not provide an explanation for its decision, the federal habeas court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991) (the federal court may look through to the last reasoned state court decision).

Where the state court summarily denied a claim but there is no reasoned state-court decision on the claim, a presumption exists that the state court adjudicated the

claim on the merits, unless "there is reason to think some other explanation for the state court's decision is more likely." *Harrington*, 562 U.S. at 99–100. In that case, a reviewing federal court "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.

In considering a habeas petitioner's claims under section 2254(d), the federal court takes into account only the evidence presented in state court. *Pinholster*, 563 U.S. at 185–87.

The federal court's review is de novo for claims not adjudicated on their merits by the state courts. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

<u>Procedural Default and *Martinez*</u>

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court held that a state prisoner who fails to comply with the state's procedural requirements in presenting claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. *Coleman*, 501 U.S. at 731–32 ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external

impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989), citing *United States v. Frady*, 456 U.S. 152, 170 (1982).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel. The *Coleman* Court had held that the absence or ineffective assistance of state post-conviction counsel generally could not establish cause to excuse a procedural default because there is no constitutional right to counsel in state post-conviction proceedings. *See Coleman*, 501 U.S. at 752–54. In *Martinez*, however, the Supreme Court established an equitable exception to that rule, holding that the absence or ineffective assistance of counsel at an initial-review collateral proceeding may establish cause to excuse a petitioner's procedural default of substantial claims of ineffective assistance of trial counsel. *See Martinez*, 566 U.S. at 9. The Court described "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 8.

Standards Governing Claims of Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two-part test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of

counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated a claim of ineffective assistance of counsel under *Strickland*, establishing that the state court's decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.' [*Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam)].").

Grounds 1A, 1B and 2

In Ground 1A, Richard claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, on account of his trial counsel's failure "to call lay witnesses in support of the theory of self-defense." Third Amended Petition (ECF No. 51), pp. 11–19. In Ground 1B, Richard claims that his federal

constitutional rights were violated as a result of ineffective assistance of his trial

counsel, on account of his trial counsel's failure "to present expert evidence regarding

psychological issues involving intimate partner violence." *Id.* at 19–25. In Ground 2,

Richard claims that his federal constitutional rights were violated as a result of

ineffective assistance of his trial counsel, because of trial counsel's failure to present

certain evidence—the same evidence he points to in Grounds 1A and 1B—in mitigation

at Richard's sentencing. *Id.* at 31–32.

Richard asserted these claims in his state habeas action. *See* Supplemental

Petition for Post-Conviction Writ of Habeas Corpus, Exh. 11 (ECF Nos. 9-11, 10-1, 10-

2); Amended Supplemental Petition for Post-Conviction Writ of Habeas Corpus, Exh. 13

(ECF No. 10-4). The state district court held an evidentiary hearing, at which Richard

and his trial counsel testified. *See* Transcript of Evidentiary Hearing, Exh. 161 (ECF No.

40-1). After the evidentiary hearing, the court appointed an expert on battered-spouse

syndrome to evaluate Richard. *See* Order Appointing Dr. Shera Bradley, Ph.D. as Court

Appointed Psychologist, Exh. 17 (ECF No. 11-2). Then, after entertaining supplemental

briefing (*see* Second Supplemental Petition for Writ of Habeas Corpus, Exh. 18 (ECF

No. 11-3)) and oral argument (*see* Transcript of Proceedings, January 20, 2016, Exh.

180 (ECF No. 40-20)), the state district court denied relief. *See* Findings of Fact,

Conclusions of Law and Order, Exh. 22 (ECF No. 11-7). Richard appealed, and the

Nevada Court of Appeals affirmed, ruling as follows on these claims:

> First, Richard argued his trial counsel was ineffective for failing to
> present a defense based upon battered spouse syndrome and for failing
> to present witnesses who could have supported such a defense. Richard
> failed to demonstrate his trial counsel's performance was deficient or
> resulting prejudice. "Where counsel and the client in a criminal case
> clearly understand the evidence and the permutations of proof and
> outcome, counsel is not required to unnecessarily exhaust all available
> public or private resources" in order to properly represent a defendant.
> *Molina v. State*, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004). At the
> evidentiary hearing, trial counsel testified Richard informed him of the
> victim's aggressive actions and he examined battered spouse syndrome
> as a possible defense, but concluded there were problems with such a
> defense in this matter and focused on self-defense for the trial. Trial
> counsel also testified he interviewed witnesses who could have testified
> regarding the relationship between Richard and the victim, as well as

Richard's reaction to confrontation, but chose not to present their testimony at trial out of a concern they would contradict Richard's testimony. Tactical decisions such as these "are virtually unchallengeable absent extraordinary circumstances," *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which the district court concluded Richard did not demonstrate. Substantial evidence supports the district court's conclusion in this regard.

In addition, the expert-witness report Richard presented during the postconviction proceedings did not diagnose Richard with battered spouse syndrome, but rather concluded he had different conditions stemming from his difficult upbringing and substance abuse. Under these circumstances, Richard failed to demonstrate a reasonable probability of a different outcome at trial had counsel presented a defense based upon battered spouse syndrome or presented witnesses in an effort to support such a defense. Therefore, we conclude the district court did not err in denying this claim.

Second, Richard argued his trial counsel was ineffective for failing to present evidence to support Richard's theory of self-defense. Richard failed to demonstrate his trial counsel's performance was deficient or resulting prejudice. As stated previously, trial counsel testified at the evidentiary hearing he interviewed witnesses in preparation for trial, but chose not to present their testimony at trial out of a concern they would contradict Richard's testimony. Tactical decisions such as these "are virtually unchallengeable absent extraordinary circumstances," *id.*, which the district court concluded Richard did not demonstrate. Substantial evidence supports the district court's conclusion in this regard. In addition, during trial Richard testified regarding his belief in his need to act in self-defense and counsel questioned him at length regarding his thoughts and actions during the incident. As Richard testified regarding the incident and the witnesses Richard identified did not actually witness the incident that caused the victim's death, Richard failed to demonstrate a reasonable probability of a different outcome had trial counsel presented these potential witnesses at trial in support of Richard's assertion of self-defense. Therefore, we conclude the district court did not err in denying this claim.

Third, Richard argued his trial counsel was ineffective for failing to present mitigation evidence or expert witness testimony at the sentencing hearing regarding Richard's mental health issues and history of suffering abuse. Richard failed to demonstrate his trial counsel's performance was deficient or resulting prejudice. Trial counsel filed a sentencing memorandum that included a report prepared by a psychologist who interviewed Richard at length. The report noted Richard's abusive upbringing and psychological difficulties. During the sentencing hearing, Richard's counsel referenced the sentencing memorandum and the sentencing court stated it had read the report. Richard failed to demonstrate these were the actions of an objectively unreasonable defense attorney. As trial counsel filed a sentencing memorandum containing information regarding Richard's mental health issues and history of suffering abuse, Richard failed to demonstrate a reasonable probability of a different outcome at the sentencing hearing had counsel presented further information of this nature. Therefore, we conclude the district court did not err in denying this claim.

1

2          Next, Richard argues the district court erred in declining to
3   conduct a second evidentiary hearing after Richard supplemented the
    postconviction record with a report regarding a new psychological
4   examination. Following the first evidentiary hearing, the district court ·
    permitted Richard to retain an expert to further investigate whether a
5   defense based upon battered spouse syndrome would have been
    appropriate. As noted previously, the resulting report did not indicate
6   Richard suffered from battered spouse syndrome. Given the nature of the
    report, the district court concluded a new evidentiary hearing was not
7   necessary and denied the petition. Because a claim based upon battered
    spouse syndrome would not have entitled Richard to relief, we conclude
8   the district court properly denied the petition without conducting a second
    evidentiary hearing. *See Hargrove v. State*, 100 Nev. 498, 502–03, 686
    P.2d 222, 225 (1984).

9   Order of Affirmance, Exh. 28 (ECF No. 11-13), pp. 2–4. This ruling by the Nevada Court

10  of Appeals was not unreasonable.

11          In Ground 1A, Richard claims that his trial counsel should have called several

12  lay witnesses to support his defense. *See* Third Amended Petition (ECF No. 51), pp.

13  11–19. But, as the Nevada Court of Appeals noted, Richard's trial counsel testified that

14  he knew of those potential witnesses, knew how they would testify, and considered

15  calling them to testify, but decided not to, because calling them would present a danger

16  of discrediting Richard's own testimony. *See* Transcript of Evidentiary Hearing, Exh.

17  161, pp. 32–36 (ECF No. 40-1, pp. 33–37). Specifically, counsel testified as follows:

18          Credibility is key. My client testified. It was very important to me that our
19          defense was consistent. I didn't want any witnesses that were going to
            take the stand and impeach my -- any of my own witnesses take the stand
20          and impeach my own client.

21  *Id.* at 33 (ECF No. 40-1, p. 34). Counsel also testified as follows, under questioning by

22  the court:

23          A.      …. And you're right, there were witnesses that were going to
            testify to previous instances I think as well. And there were, in my opinion
24          when you take the stand your credibility is the most important aspect of
            your testimony. And in my memory I was concerned that they would not
25          be consistent with what my client testified to on the stand.

26          And the only person who knew or didn't know what happened in the
            apartment, which is where the actual incident took place was my client.
27          There was only the two of them. And the victim of course is deceased. So
            it was paramount to me that my client had credibility when he testified
28          before the jury. So I didn't want to have witnesses that would come in and

11

provide information that was inconsistent with what he said, because what he said was so crucial.

Q. So before or as you were making that decision had you actually talked to those witnesses yourself and so you knew what they were going to say and made the decision after hearing your client's testimony, that this witness is going to contradict my client?

A. That is correct.

*Id.* at 34–35 (ECF No. 40-1, pp. 35–36).

There was evidence before the state district court corroborating trial counsel's testimony that he believed the possible witnesses suggested by Richard could reveal information that would be harmful to Richard's case. For example, an investigator's report of an interview with potential witness Elbert Black stated:

Elbert said that he noticed a change in Marvin after Marvin started to use "sherms" laced with embalming fluid. It was a mental change and Elbert didn't like it. It bothered Elbert so much that he had mentioned to his mother and father … that somebody had to get Marvin some help with his addiction. Elbert said that when Marvin was living with him, he didn't allow Marvin to smoke "sherms" ….

*          *          *

Elbert seems to remember something about Elbert and Loreal's mother, Laura, having some argument ... and that Laura had a restraining order out against Marvin.

*          *          *

Elbert said that over the years Loreal and Marvin would come to his house to visit and at least once he remembers seeing a bruise on Loreal's arm. Elbert would ask what happened and Loreal would tell Elbert that she and Marvin would be wrestling and playing around. Elbert said that he believes that was something Loreal and Marvin did often and that was wrestling and playing around. Elbert said that he does not remember [ever] seeing any bruises on Marvin.

Investigator's Report of Interview with Elbert Black, Exh. 4 to Supplemental Petition (ECF No. 9-11, pp. 165–67). Another example is an investigator's report of an interview with potential witness Asha Hollman:

… [S]he came to realize that both Loreal and Marvin had mental issues. She said that both would start arguments over little things and the verbal arguments would escalate into yelling and calling each other names and using cuss words.

* * *

… Loreal showed Asha a photo of herself in her cell phone. Loreal had a right black eye in the photo and Loreal told Asha that Marvin had hit her. Asha said that Marvin was just [as] bad as Loreal. He would raise his voice, cuss, and use foul language also.

* * *

Asha said that Loreal would drink alcohol and on at least one [occasion] that she is aware of Marvin had come home after using "sherm's". On one of those occasions Loreal got mad at Marvin for using 'sherms".

Investigator's Report of Interview with Asha Hollman, Exh. 6 to Supplemental Petition (ECF No. 9-11, pp. 175–76); *see also* Written Statement of Erin Black, Exh. 5 to Supplemental Petition (ECF No. 9-11, pp. p. 169) ("During the time we were together, I've never seen, witnessed, nor been involved in any disputes with him except one instance. It was the year of 2005. I filed a statement but never [pursued] or pressed charges."); Incident Report, Regarding Battery/Domestic Violence Incident, Exh. 8 to Supplemental Petition (ECF No. 9-11, pp. 187–88); Report Regarding Domestic Violence Investigation, Exh. 9 to Supplemental Petition (ECF No. 9-11, pp. 191–92) (Alexis Lintgeris-Porto's statement to police regarding incident in Walmart parking lot); Incident Report, Exh. 10 to Supplemental Petition (ECF No. 9-11, pp. 194–98 (regarding incident in Walmart parking lot); Investigator's Report of Interview with Brenda Smith, Exh. 16 to Supplemental Petition (ECF No. 10-1, p. 48) (Brenda Smith was aware of Richard's use of "sherm").

Therefore, there was substantial evidence, presented in the state habeas action, indicating that Richard's trial counsel had available the witnesses suggested now by Richard, and knew how they would testify, but he made a sound strategic decision not to call them to testify. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *see also Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir. 2009) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess"). This Court finds that

1  the Nevada Court of Appeals' ruling in this regard was not objectively unreasonable.

2  The Court will deny habeas corpus relief on Ground 1A.

3       In Ground 1B, Richard claims that his trial counsel was ineffective for not

4  presenting expert testimony at trial regarding his alleged psychological conditions,

5  including posttraumatic stress disorder (PTSD) and battered spouse syndrome.

6  Specifically, Richard points to the reports of Dr. Michelle Carro (Exh. 113 (ECF No. 38-

7  15)) and Dr. Shera Bradley (Exh. 35 (ECF No. 21-1) (sealed)), and he asserts that his

8  trial counsel should have presented testimony of Dr. Carro and/or Dr. Bradley, or similar

9  testimony. *See* Third Amended Petition (ECF No. 51), pp. 19–25. The Nevada Court of

10  Appeals reasonably determined that Richard's trial counsel did not perform

11  unreasonably in this manner, and, at any rate, Richard was not prejudiced.

12       Dr. Carro's report described Richard's difficult childhood, but Dr. Carro did not

13  diagnose Richard as suffering from PTSD. *See* Report of Dr. Michelle Carro, Exh. 113

14  (ECF No. 38-15). Dr. Carro's report does not make any mention of abuse of Richard by

15  Loreal, and it provides no support for a theory that Richard suffered from PTSD as a

16  result of such abuse, or that he suffered from battered spouse syndrome. *See id.* On the

17  other hand, Dr. Carro's report included a statement that Richard "believed that he

18  needed to compromise his opinions and desires first before things would eventually turn

19  his way," and "this led to a build up of anger and resentment which would manifest itself

20  in passive-aggressive behavior, psychosomatic symptoms, substance abuse and

21  occasional uncontrolled outbursts of temper." *See id.* at 3 (ECF No. 38-15, p. 6).

22  Dr. Carro also stated in her report: "Mr. Richard is a gentleman with a poorly developed

23  sense of self and underdeveloped ability to cope effectively in the face of adult stressors

24  and relationships." *Id.* at 4 (ECF No. 38-15, p. 7). Dr. Carro's report refers repeatedly to

25  Richard's abuse of drugs. *See id.* There is nothing in Dr. Carro's report that would have

26  provided any significant support for Richard's self-defense theory, or for a theory that he

27  suffered from PTSD or battered spouse syndrome as a result of abuse by Loreal.

28

Dr. Bradley's report, like Dr. Carro's, describes events from Richard's difficult childhood. *See* Report of Dr. Shera Bradley, Exh. 35 (ECF No. 21-1). Dr. Bradley's report describes Richard's long-term, heavy use of PCP and other illegal drugs. *Id.* at 4, 6, 13. The report goes on to describe events from Richard's tumultuous, and sometimes violent, relationship with his ex-wife, Erin Black. *See id.* at 4–5. It describes Richard's criminal history. *Id.* at 7, 9–10. It notes that Richard "was booked for battery domestic violence on June 7, 2007 with Loreal listed as the victim." *Id.* at 7. The report states that, on the day that Loreal was killed, Richard "smoked PC and was hallucinating" and was "all scared and paranoid." *Id.* at 11. Regarding the incident that led to Loreal's death, the report states: "He stated Loreal was yelling and grabbed a knife and then he grabbed a knife and 'poked her' twice." *Id.* at 12. Dr. Bradley's report describes Loreal's aggressive and violent treatment of Richard, and their generally violent relationship (*see id.* at 6, 10–13). Dr. Bradley diagnosed Richard as having PTSD (*id.* at 12), but her report appears to attribute the PTSD to Richard's childhood, not to his relationship with Loreal. *See id.* at 13 ("Marvin has experienced a great deal of abuse during his childhood and he described symptoms that are consistent with PTSD."). Dr. Bradley's report concludes as follows:

> During the two years that Loreal and Marvin were together, there were repeated physical altercations, some of which resulted in police involvement. Marvin described that they were selling drugs, he continued using drugs, and there were infidelities on both parts. He indicated Loreal engaged in prostitution. Over time, Marvin became increasingly paranoid. He thought cars were following him and law enforcement was tapping his phones. The day of the instant offense, Marvin used PCP, alcohol, marijuana, and cough syrup. He described that he was hallucinating and was feeling more and more paranoid. He reached out for support, by way of contacting Ms. Maddox, only to learn that she had Alzheimer's. He described feeling alone and that these were signs to him. He stated that after he went to Ms. Maddox's house, they went shopping, however he stayed in the car and smoked more marijuana. After they were back at home, he and Loreal were fighting and he reports that he tried to disengage from that by going to sleep after drinking Nyquil. After he awoke, they engaged in more fighting which ultimately resulted in Marvin stabbing Loreal.
>
> From the data available for this evaluation, it seems clear that Marvin and Loreal had a conflictual relationship and the day of the crime was no different. Marvin's reactions during the altercation with Loreal were

> fueled by the constant drug abuse during the time leading up to the day, in addition to the high level of intoxication that was likely present, based on his self-reported use. He had poor coping skills and did not deal with conflict well. Many children who have experienced abuse have poor skills in dealing with altercations and may cower, retreat, or become aggressive when confronted. It is my opinion that his behavior that day was a

> combination of the aggressive nature of his relationship with Loreal, his deficit interpersonal skills, and the effects of the drugs he was using.

*Id.* at 13–14. In sum, there is little in Dr. Bradley's report supporting a theory that Richard stabbed Loreal in self-defense; on the other hand, the report contains a great deal of information that would have reflected poorly on Richard and would have been harmful to his defense.

Richard's trial counsel did not perform unreasonably in choosing not to present, before the jury, testimony of Dr. Carro or Dr. Bradley, or a similar expert.

The Nevada Court of Appeals' ruling on the claim in Ground 1B was reasonable; it was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and it was not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The Court will deny habeas corpus relief on Ground 1B.

In Ground 2, Richard claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, because of trial counsel's failure to present certain evidence—the same evidence he points to in Grounds 1A and 1B—in mitigation at sentencing. *Id.* at 31–32.

Richard's trial counsel submitted two sentencing memoranda prior to Richard's sentencing. The first included the report by Dr. Carro. *See* Sentencing Memorandum, Exh. 113 (ECF No. 38-15). The second included a letter from Richard's ex-wife, conveying her request that the court show leniency toward Richard. *See* Supplemental Sentencing Memorandum, Exh. 114 (ECF No. 38-16). At the sentencing hearing, Richard made a lengthy statement. *See* Transcript of Sentencing, Exh. 116, pp. 3–6 (ECF No. 39-1, pp. 4–7). Loreal's mother spoke at the sentencing hearing and asked the court to have mercy on Richard. *See id.* at 9–12 (ECF No. 39-1, pp. 10–13). The

prosecution asked for consecutive prison sentences of 10 years to life and 8 to 20 years. *See id.* at 3 (ECF No. 39-1, p. 4). The judge sentenced Richard to consecutive prison sentences of 10 to 25 years and 3 to 8 years. *See id.* at 12–15 (ECF No. 39-1, pp. 13–16); Judgment of Conviction, Exh. 2 (ECF No. 9-2).

The Court determines that the claim in Ground 2 is without merit, and the Nevada Court of Appeals' affirmance of denial of relief on the claim was reasonable. The record reflects that, at sentencing, the court had information about Richard's mental health background and about the relationship between Richard and Loreal. There is no showing that Richard's counsel acted unreasonably in not presenting other witnesses or evidence at the sentencing hearing. Certainly, there is no showing that presenting additional witnesses or evidence would have raised a reasonable probability of a better outcome; as it was, the judge imposed a lower sentence than was requested by the State. The Court will deny habeas corpus relief on Ground 2.

Richard requests an evidentiary hearing on Grounds 1A, 1B and 2. *See* Motion for Evidentiary Hearing (ECF No. 75), pp. 6–8. These claims, though, were ruled on, on their merits, by the state court, and this Court determines that Richard does not show the state-court rulings to be unreasonable under 28 U.S.C. § 2254(d). Therefore, further evidentiary development is unwarranted. The Court will deny the motion for an evidentiary hearing on these claims. *See Pinholster*, 563 U.S. at 185–87.

Ground 1E

In Ground 1E, Richard claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, because "counsel failed to follow up on juror tampering." Third Amended Petition (ECF No. 51), pp. 27–29.

In ruling on Respondents' motion to dismiss, the Court determined that this claim was not asserted by Richard in state court, but would now be procedurally barred in state court, so it is technically exhausted but potentially barred by the procedural default doctrine. *See* Order entered November 4, 2019 (ECF No. 61), pp. 11–12. The Court then recognized that Richard might be able to overcome the procedural default by

showing, under *Martinez*, that his state post-conviction counsel was ineffective for not asserting the claim in his state habeas action. *See Id.* However, the Court determined that the question whether Richard can overcome the procedural default of the claim is intertwined with its merits, such that the procedural default issue would be better addressed in conjunction with the claim's merits, in light of Respondents' answer and Richard's reply. *See id.*

On the sixth day of Richard's trial, an alternate juror found, in her juror's notebook, a piece of paper with the word "guilty" written on it, and she brought this to the trial court's attention. *See* Trial Transcript, July 19, 2010, Exh. 98, p. 97 (ECF No. 37-5, p. 33). The judge observed that the note appeared to be on the same size paper as is in the jury notebooks. *See id.* The judge made the note part of the record. *See id.* The judge informed counsel that the court reused jury notebooks and it was possible the note was left in the jury notebook after a previous trial. *Id.* at 97–98 (ECF No. 37-5, pp. 33–34). The judge informed counsel that the previous trial in that court, about two weeks before, had ended in a guilty verdict. *Id.* at 98 (ECF No. 37-5, p. 34). The next day, the court brought the alternate juror in for questioning. *See* Trial Transcript, July 20, 2010, Exh. 100, p. 5 (ECF No. 38-2, p. 6). The alternate juror described how she found the note in her juror's notebook. *See id.* at 6 (ECF No. 38-2, p. 7). She said she had taken a lot of notes but had not noticed it before. *See id.* The judge stated:

> We've looked at it and it does appear to be the same type of paper that's in those notebooks. We do reuse those notebooks, and in our discussion we had thought perhaps it was one that was left over in a notebook from a previous trial, because they would have taken a vote and done things in that previous trial as well. But obviously, we don't know exactly.

*Id.* Counsel were given an opportunity to question the alternate juror, and defense counsel asked her how many pages back in the notebook she found the note, and she explained that she found it a few pages into the notebook from where she had stopped writing her notes. *See id.* at 7–8 (ECF No. 38-2, pp. 8–9). Defense counsel also asked if she had any communications with anyone who suggested that they put the note there, and she answered that she had not. *Id.* at 8–9 (ECF No. 38-2, pp. 9–10). Then, under

questioning by the judge, the alternate juror stated that she was not affected by the

note, and it did not cause her to be swayed in either direction. *Id.* at 9 (ECF No. 38-2, p.

10). The judge then discussed the matter with counsel, and defense counsel stated:

> Your Honor, I could file an objection and raise the issue, but I've just, from the beginning, felt that this woman made a very good juror. She's been always attentive, always following the evidence and, you know, her notebook shows a book full of notes that she's taken as she filtered through it here today.
>
> So you know, I'm hesitant – the other thing, she's an alternate. I don't even know – I doubt we'll even get to her at this point. So at this point, I just appreciate the Court, you know, creating the record and I'm not going to object or do anything other than I've told the Court, that I appreciate the work that you've done to find out the facts of this so far.

*Id.* at 10 (ECF No. 38-2, p. 11). The prosecutor similarly expressed that she did not

think anything further had to be done; she stated:

> And I think – well, defense counsel as well as ourselves had probably come to the conclusion that no one did it purposefully. It was probably from an old juror notebook and it just happened to be in there. So with that, Judge, we'll submit it.

*Id.* at 11 (ECF No. 38-2, p. 12). The alternate juror was not excused, and the trial

proceeded.

There was—and is—no evidence that the note was placed in the alternate juror's

notebook by another juror or by anyone else involved in Richard's trial, or that it was

meant as a comment on Richard's trial, or that the alternate juror was affected by it.

This claim is based purely on speculation. The evidence, and the conclusion of defense

counsel, the prosecutor, and the judge, was that the note was left in the notebook after

a previous trial and had nothing to do with Richard's trial.

This Court determines that this claim of ineffective assistance of trial counsel is

meritless. Richard's trial counsel performed in a reasonable manner with respect to the

paper found in the alternate juror's notebook, and, at any rate, there is no showing that

Richard was prejudiced. The Court finds that this claim is insubstantial, within the

meaning of *Martinez*, and, therefore, Richard does not meet the standard described in

*Martinez*. Nor does Richard make any showing that an evidentiary hearing is warranted

on this claim; Richard does not give any indication what further he would attempt to do at an evidentiary hearing to substantiate the claim. The claim will be denied as procedurally defaulted.

<u>Grounds 1F and 5</u>

In Ground 1F, Richard claims that his federal constitutional rights were violated as a result of ineffective assistance of his trial counsel, on account of his trial counsel's failure "to litigate the issue whether the police acted in bad faith when they failed to test Mr. Richard's blood." Third Amended Petition (ECF No. 51), pp. 29–31. And, in the part of Ground 5 remaining to be adjudicated, Richard claims that his federal constitutional rights were violated because "[t]he State failed to preserve material evidence by not testing Mr. Richard's blood, [and] it made that decision in bad faith." *Id.* at 33–34; *see also* Order entered November 5, 2019 (ECF No. 61) (dismissing the claim in Ground 5 that Richard's federal constitutional rights were violated because the detective lied under oath).

In ruling on Respondents' motion to dismiss, the Court determined that the claim in Ground 1F was not asserted by Richard in state court, but would now be procedurally barred in state court, so it is technically exhausted but potentially barred by the procedural default doctrine. *See* Order entered November 4, 2019 (ECF No. 61), pp. 11–12. The Court recognized that Richard might be able to overcome the procedural default by showing, under *Martinez*, that his state post-conviction counsel was ineffective for not asserting the claim in his state habeas action. *See Id.* However, the Court determined that the question whether Richard can overcome the procedural default of the claim is intertwined with its merits, such that the procedural default issue would be better addressed in conjunction with the claim's merits, in light of Respondents' answer and Richard's reply. *See id.*

Richard alleges that the police acted in bad faith in not having his blood tested for intoxicants after his arrest. Third Amended Petition (ECF No. 51), pp. 29–31. Richard alleges that, at the time, he was under the influence of alcohol, PCP, marijuana and

Nyquil. *Id.* at 29. He alleges that the effect of these substances, together with sleep deprivation and other factors, rendered him unable to give a voluntary statement. *Id.*

Richard's trial counsel moved to suppress his statement to the police, based in part on his intoxication, and the court held an evidentiary hearing on the motion. *See* Motion to Suppress, Exh. 83 (ECF No. 34-21); Transcript of Richard's Statement to Police, Exh. 30 (ECF No. 19-1); Trial Transcript, July 14, 2010, Exh. 94, pp. 3–53 (ECF No. 36-1, pp. 4–54) (evidentiary hearing). Detective Martin Wildemann, who conducted the interrogation, testified. Trial Transcript, July 14, 2010, Exh. 94, pp. 3–34 (ECF No. 36-1, pp. 4–35). Detective Wildemann testified that, the procedures employed with respect to a suspect who may be under the influence of a substance, including whether to have the suspect's blood tested, was a "judgment call." *Id.* at 18–23 (ECF No. 36-1, pp. 19–24). Detective Wildemann testified that he had never had a blood test done on a suspect, and he had not heard of that being done by others. *Id.* Detective Wildemann testified that Richard's gait appeared to be steady, and he was articulate and lucid; based on such factors, Detective Wildemann believed that Richard was able to give a voluntary statement. *Id.*

The trial judge ruled that, while Richard appeared sleepy on the videotape of the interrogation, and while he was likely under the influence of some substance, he was generally alert and able to understand the questions he was asked, his statement was generally coherent, and he did not appear to be so intoxicated as to be unable to voluntarily waive his rights and give the statement; the trial court therefore denied the motion to suppress and ruled Richard's statement admissible. *See id.* at 50–52 (ECF No. 36-1, pp. 51–53).

Richard has filed, as an exhibit, a report of a defense investigator's interview with Loreal's mother, Laura, that states:

> She [Laura] stated that Detective [Wildemann] took her aside and explained to her that off the record he didn't want to see Marvin get an insanity or under the influence defense because of Sherm. (PCP)

Report of Interview with Laura Goodwin, Exh. 31 (ECF No. 19-2, p. 3). Richard claims that his trial counsel knew of this information but failed to question Detective Wildemann, or call Laura to testify, to bring it out in support of the motion to suppress. Third Amended Petition (ECF No. 51), p. 30. Richard claims that if the trial court had heard about Detective Wildemann's alleged comment to Laura, there is a reasonable probability the court would have granted the motion to suppress, Richard's statement to the police would not have come into evidence, and the result of the trial would have been more favorable for Richard. *Id.* at 30–31.

This Court determines that this claim is insubstantial, in that there is no showing that Richard's trial counsel performed unreasonably, and there is, at any rate, no showing that Richard was prejudiced.

The Court notes first that, when he was arrested, Richard obviously knew that he was under the influence of PCP, but, while he told the detective that he had consumed alcohol, marijuana, and Nyquil, he did not mention the PCP. This—not the lack of a blood test—was the primary reason why Richard's PCP use was not discovered by the police. Moreover, there was nothing to stop Richard from informing the trial court, in the context of the motion to suppress, that he had used PCP, and may have been under its influence when he gave his statement.

The Court also notes that, while the report of the investigator's interview with Laura indicates that Detective Wildemann told Laura that he did not want Richard to have a defense based on his use of PCP, the report does not indicate that was the reason that Detective Wildemann did not have Richard's blood tested. That step in the logic of Richard's claim is unsupported by any evidence and is contradicted by the testimony of Detective Wildemann's testimony about why he did not have a blood test done.

And, most importantly, the trial court conducted an evidentiary hearing to determine whether or not Richard was so intoxicated as to be unable to voluntarily waive his rights and give a statement to the police, and the court ruled that he was not.

1   There is no showing that adding PCP to the mix of substances that Richard had

2   consumed—or attempting to cast doubt on the detective's explanation why he did not

3   have Richard's blood tested—would have altered the trial court's view of the effect of

4   Richard's intoxication on his ability to voluntarily waive his rights and give a statement to

5   the police.

6           This Court determines that this claim of ineffective assistance of trial counsel is

7   without merit. Richard's trial counsel performed in a reasonable manner, and there is no

8   showing that Richard was prejudiced. Richard does not give any indication what

9   evidence he would proffer at any evidentiary hearing to support this claim, and the Court

10  determines that an evidentiary hearing on the claim is unwarranted. The Court finds this

11  claim is insubstantial, within the meaning of *Martinez*. The claim will be denied as

12  procedurally defaulted.

13          In Ground 5, Richard makes the related claim that his federal constitutional rights

14  were violated because "[t]he State failed to preserve material evidence by not testing

15  Mr. Richard's blood, [and] it made that decision in bad faith…." Third Amended Petition

16  (ECF No. 51), pp. 33–34.

17           Richard asserted the claim in Ground 5 on his direct appeal, and the Nevada

18  Supreme Court ruled as follows:

19

20              … Richard contends that "[t]he State failed to preserve key
        evidence by not testing [his] blood-alcohol content on the night of the
21      incident" and thereby deprived him of due process by preventing him from
        presenting an adequate defense at his trial. We construe this claim of
22      error as a claim that the State failed to collect evidence, *see Daniels v.*
        *State*, 114 Nev. 261, 266, 956 P.2d 111, 114 (1998), and, because
23      Richard failed to present this claim in the court below, we review for plain
        error, *see* NRS 178.602; *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93,
24      94–95 (2003). We conclude that Richard has failed to make a threshold
        showing that the blood evidence was material and the State's failure to
25      gather this evidence was the result of negligence, gross negligence, or
        bad faith, *see Daniels*, 114 Nev. at 267-68, 956 P.2d at 115 (establishing
26      two-part test for assessing claims that the State failed to gather evidence),
        and therefore he has not demonstrated plain error.

27  Order of Affirmance, Exh. 6, p. 2 (ECF No. 9-6, p. 3).

28

As this claim was ruled upon, on its merits, by the Nevada Supreme Court, this Court considers the claim under the standard set forth in 28 U.S.C. § 2254(d). The claim fails under that standard, because there is no Supreme Court precedent clearly establishing that it is a violation of a defendant's federal constitutional rights for law enforcement to fail to gather potentially exculpatory evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 59 (1988) ("[T]he police do not have a constitutional duty to perform any particular tests."); *Miller v. Vasquez*, 868 F.2d 1116, 1119–20 (9th Cir. 1989) (ruling that Supreme Court precedent did not impose upon police a duty to obtain evidence, as opposed to a duty to preserve evidence that is gathered). Absent Supreme Court precedent establishing such a constitutional right, AEDPA, as codified at 28 U.S.C. § 2254(d), precludes relief on this claim. *See Carey v. Musladin*, 549 U.S. 70, 76–77 (2006) (holding that "clearly established federal law," under 28 U.S.C. § 2254(d), refers to holdings of the United States Supreme Court). The Court will, therefore, deny relief on Ground 5.

Ground 6

In Ground 6, Richard claims that his federal constitutional rights were violated because "[t]he State failed to timely turn over relevant discovery to defense counsel." Third Amended Petition (ECF No. 51), pp. 34–35. Richard's claim is that, while the defense had earlier received a transcript and audio recording of his statement to the police, the State did not turn over the video recording of his statement until just a few days before his trial commenced. *See id.* Richard claims that the delay in him receiving the video record of his statement hampered him in litigating the admissibility of the statement. *See id.*

Richard asserted this claim on his direct appeal, and the Nevada Supreme Court ruled as follows:

> … [A]ppellant Marvin Deandre Richard contends that his due process rights were violated when the State failed to provide timely discovery of the video recording of his police interview. He argues that this untimely discovery violates *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny and asserts that the district court should have dismissed the

charges or granted his motion for a continuance. We conclude that the untimely discovery did not violate *Brady* because the evidence was provided before the start of trial, it was not favorable, and it was not material. *See Mazzan v. Warden*, 116 Nev. 48, 67, 993 P.2d 25, 37 (2000) (identifying the components of a *Brady* violation). Further, the district court did not abuse its discretion by denying Richard's motions for dismissal or continuance because Richard failed to show that the State acted in bad faith or that he was prejudiced by the untimely discovery of the video recording of the interview. *See* NRS 174.295(2); *Evans v. State*, 117 Nev. 609, 638, 28 P.3d 498, 518 (2001).

Order of Affirmance, Exh. 6, pp. 1–2 (ECF No. 9-6, pp 2–3).

As this claim was ruled upon, on its merits, by the Nevada Supreme Court, this Court considers the claim under the standard set forth in 28 U.S.C. § 2254(d).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To show a *Brady* violation, a petitioner must demonstrate that: (1) the suppressed evidence is favorable to the accused, either as exculpatory or impeachment evidence; (2) the State suppressed the evidence either willfully or inadvertently; and (3) the defendant was prejudiced because the suppressed evidence was material, i.e., there was a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Stickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Brady*, 373 U.S. at 87.

Richard claims that the videotape of his statement to the police was material because it showed that he was intoxicated when he gave the statement, and, as such, it was evidence supporting his motion to suppress the statement. *See* Third Amended Petition (ECF No. 51), p. 35. However, the trial court viewed the videotape during the evidentiary hearing on the motion to suppress, and determined that it showed that, while Richard was possibly under the influence of some substance, it appeared that he was alert and coherent, and that he was not so intoxicated as to be unable to voluntarily

1    waive his rights and answer questions. *See* Trial Transcript, July 14, 2010, Exh. 94, pp.

2    50–52 (ECF No. 36-1, pp. 51–53).

3        Furthermore, the State did in fact turn over the videotape to the defense in

4    advance of the trial—the Friday before the Monday commencement of the trial. *See*

5    Third Amended Petition (ECF No. 51), pp. 34–35. The prosecutor told defense counsel

6    and the trial court that she did not receive the videotape from the police until just before

7    she disclosed it to the defense. *See id.* Richard does not show the prosecution's

8    delayed disclosure of the videotape to be a violation of *Brady* or any rule established by

9    any other United States Supreme Court precedent.

10       Lastly, Richard does not show that he was prejudiced by the delayed disclosure

11   of the videotape. As is discussed above, the trial court did view the videotape and

12   determined that it did not show Richard to be so intoxicated as to render his waiver of

13   his rights involuntary. Richard alleges that the delayed disclosure of the videotape

14   prevented him from consulting with an expert regarding it before the hearing on the

15   motion to suppress, but he does not make any showing regarding what an expert may

16   have seen in the videotape to support the motion to suppress.

17       Richard has not demonstrated that the Nevada Supreme Court's rejection of this

18   claim was "so lacking in justification that there was an error well understood and

19   comprehended in existing law beyond any possibility for fair minded disagreement." *See*

20   *Harrington*, 562 U.S. at 103. The Court will deny relief on Ground 6.

21       <u>Certificate of Appealability</u>

22       The standard for the issuance of a certificate of appealability requires a

23   "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The

24   Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

25           Where a district court has rejected the constitutional claims on the
            merits, the showing required to satisfy § 2253(c) is straightforward: The
26          petitioner must demonstrate that reasonable jurists would find the district
            court's assessment of the constitutional claims debatable or wrong. The
27          issue becomes somewhat more complicated where, as here, the district
            court dismisses the petition based on procedural grounds. We hold as
28          follows: When the district court denies a habeas petition on procedural

grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also James v. Giles, 221 F.3d 1074, 1077–79 (9th Cir. 2000). Applying this standard, the Court finds that a certificate of appealability is unwarranted.

Conclusion

**IT IS THEREFORE ORDERED** that Petitioner's Motion for an Evidentiary Hearing (ECF No. 75) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Third Amended Petition for Writ of Habeas Corpus (ECF No. 51) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly.

DATED THIS 29th day of December , 2020 .

KENT J. DAWSON,
UNITED STATES DISTRICT JUDGE